CO–OPERATIVE SHIPPERS, INC., a
Delaware Not-For-Profit
Corporation, Plaintiff,

v.

The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY, a Delaware
Corporation, Defendant.

No. 84 C 2359.

United States District Court,
N.D. Illinois, E.D.

July 3, 1985.

Richard J. Billik, Jr., Billik and Billik,
Ltd., Chicago, Ill., Ronald N. Cobert, Robert
L. Cope, Joseph Michael Roberts, Grove,
Jaskiewicz, Gilliam and Cobert, Washington, D.C., for plaintiff.

Dennis A. Kearns, John C. Palmer, Ellen L. Falkof, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff CO–OPerative Shippers, Inc. ("CO–OP") is an association of shippers which consolidates the freight of its members and tenders the combined loads to line-haul motor and rail carriers, thereby obtaining for its members the benefit of the carriers' reduced transportation rates for volume shipping. In March of 1983, CO–OP delivered a trailer to defendant The Atchison, Topeka and Santa Fe Railway Company ("Santa Fe") for trailer-on-flatcar ("TOFC") shipment from Chicago, Illinois, to Richmond, California. The train carrying the trailer derailed in Oklahoma, damaging the trailer's cargo, and CO–OP filed this action to recover the actual value of the damaged goods. Santa Fe has admitted liability for the loss, but it disagrees as to the rate at which it should reimburse CO–OP. Rather than the full actual cost of the damaged freight, Santa Fe maintains that its liability is limited to a "released rate" of $.35 per pound. Presently before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, CO–OP's motion is granted in part and denied in part, and Santa Fe's motion is denied.

## I. BACKGROUND

### A. *Common Law Liability of Carriers*

At common law, a carrier's liability for damage to goods transported by the carrier was virtually unlimited. Though not an absolute insurer, the carrier was liable to the shipper for the full extent of the damage unless it was caused by an act of God, a public enemy, the shipper, public authority or the inherent vice or nature of the goods themselves. *E.g., Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964).[1] Courts refused to enforce exculpatory agreements between carrier and shipper purporting to relieve the carrier from all liability for property damage caused by the negligence of the carrier or its servants; such contracts were deemed to violate public policy because they tended to induce carelessness on the carrier's part. *Adams Express Co. v. Croninger*, 226 U.S. 491, 509–10, 33 S.Ct. 148, 153–54, 57 L.Ed. 314 (1913).

However, common law did permit the carrier and shipper to agree to merely limit—rather than eliminate completely—the carrier's liability for property loss or damage, so long as the shipper granted the limitation in consideration for a lower transportation rate than would reasonably be charged for the carrier's unlimited liability. *Id.; Hart v. Pennsylvania Railroad Co.*, 112 U.S. 331, 340, 5 S.Ct. 151, 155, 28 L.Ed. 717 (1884). Such agreements were justified on the grounds that the carrier was entitled to know its potential liability for property loss and to be compensated in proportion to the risk it assumed. Therefore, if a contractual limitation of liability was the result of a "fair, open, just and reasonable agreement" between carrier and shipper, entered into by the shipper "for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of risk," *Croninger*, 226 U.S. at 509–10, 33 S.Ct. at 153, and if the shipper was given "the option of higher recovery upon paying a higher rate," *Boston & Maine Railroad v. Piper*, 246 U.S. 439, 444, 38 S.Ct. 354, 355, 62 L.Ed. 820 (1918), the agreement was enforceable at common law.

### B. *Statutory Law Before Deregulation*

Congress codified these common law principles in 1906 when it passed the Carmack Amendment to the Interstate Com-

---

1. This rule of liability dates back to the Roman Republic (circa 200 B.C.) and was established very early by the English courts. *See, e.g.,* the Interstate Commerce Commission's *Rail Carrier Cargo Liability Study, A Report to Congress Pursuant to Section 211 of the Staggers Rail Act of 1980 ("I.C.C. Report to Congress"),* 3–5 (Sept. 29, 1981).

merce Act ("the Act").[2] Although the Carmack Amendment provided that no contract, rule, receipt or regulation could exempt a carrier from full liability, the courts continued to uphold reasonable released-rate agreements. *Croninger; see also Boston & Maine Railroad v. Hooker*, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868 (1914); *Kansas City Southern Railway Co. v. Carl*, 227 U.S. 639, 33 S.Ct. 391, 57 L.Ed. 683 (1913).

Carriers frequently evaded the Carmack Agreement's restrictions by publishing reduced rates based upon released values and setting full value rates at prohibitively high levels, effectively denying shippers any real choice. *I.C.C. Report to Congress*, 8. Congress responded in 1915 by passing the First Cummins Amendment to the Act, prohibiting all released-rate agreements except when the goods were concealed and their character was unknown to the carrier. However, within a year Congress determined that the First Cummins Amendment was too restrictive. In 1916 it passed the Second Cummins Amendment, returning to the common-law practice of allowing released rates but only when such rates were approved in advance by the I.C.C. and only

with "value of the property."[3] This statutory scheme lasted until the passage of the Staggers Rail Act of 1980.

## C. *Deregulation Under the Staggers Act*

In October 1980, Congress enacted the Staggers Rail Act of 1980 in order to improve the economic and competitive conditions of the national rail system "through financial assistance and freedom from unnecessary regulation." H.R.Cong.Rep. No. 1430, 96th Cong., 2d Sess. 80 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad. News 3978, 4110–11. Among other changes, the Staggers Act amended 49 U.S.C. § 10730, making § 10730(a) inapplicable to rail carriers and adding a new subsection (c) specifically relating to rail carriers. Section 10730(c) allows rail carriers to offer released rates without first obtaining I.C.C. approval, and it omits the provision that the released rate must be "reasonable under the circumstances."[4]

The Staggers Act also amended the I.C. C.'s authority to exempt carriers from regulation. Revised § 10505 directs the I.C.C. to grant an exemption when it finds that, with respect to a person, class of persons, or a transaction or service, regulation

2. This law and its later amendments are presently codified at 49 U.S.C. § 11707, which provides in relevant part that:

(a)(1) A common carrier ... shall issue a receipt or bill of lading for property it receives for transportation.... That carrier and any other common carrier that delivers the property ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property....

&ast; &ast; &ast; &ast; &ast; &ast;

(c)(1) A common carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of. the amount of recovery ... in a receipt, bill of lading, contract, rule, or tariff filed with the Commission in violation of this section is void.

&ast; &ast; &ast; &ast; &ast; &ast;

(4) A common carrier may limit its liability for loss or injury of property transported under section 10730 of this title.

3. Until mid-1980, these limitations were found in 49 U.S.C. § 10730 and its predecessor section, § 20(11). Section 10730 read, in pertinent part:

The Interstate Commerce Commission may require or authorize a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 10730 (Supp. III 1979). In June 1980, Congress passed the Motor Carrier Act of 1980. This legislation divided § 10730 into two subsections; subsection (a) consisted of the former § 10730, and subsection (b) added new provisions applying specifically to motor carriers of nonhousehold property.

4. Section 10730(c) now provides, in pertinent part, that:

A rail carrier ... may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier....

(1) is not necessary to carry out the transportation policy of section 10101a of this title;[5] and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

Moreover, § 10505(f) singled out "transportation that is provided by a rail carrier as part of a continuous intermodal movement" as a service particularly appropriate for deregulation. Acting pursuant to these directions from Congress, the I.C.C. exempted from regulation rail and truck transportation provided by rail carriers in connection with TOFC "and container-on-flatcar ("COFC") service. 46 Fed.Reg. 14,348 (1981).

Although freed from most regulation, rail carriers offering TOFC/COFC service are still subject to the liability provisions of § 11707. *American Trucking Associations, Inc. v. I.C.C.*, 656 F.2d 1115, 1124 (5th Cir.1981). Section 10505(e) states that:

> *No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title.* Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11701 of this title. (Emphasis added.)

The I.C.C. addressed the issue of carrier liability in a "Clarification of Notice of Final Rule [Exemption]," dated June 10, 1981:

> We exempted the TOFC/COFC traffic pursuant to 49 U.S.C. 10505. Subsection

(e) of 49 U.S.C. 10505 specifically states that "[n]o exemption order * * * shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with [49 U.S.C. 11707]." 49 U.S.C. 11707 imposes, on the carrier, liability for actual loss or injury to property shipped unless released rates under 49 U.S.C. 10730 are involved. Released rates under 49 U.S.C. 10730 are at the election of the shipper as an alternative to otherwise applicable full liability rates. From this it follows that our prior exemption could not enable carriers to disclaim their general loss and damage obligations.... To the extent railroad tariffs or contractual items on TOFC/COFC service are in violation of 49 U.S.C. 11707, they are unenforceable as a matter of law.

*Ex Parte No. 230 (Sub-No. 5) Improvement of TOFC/COFC Regulation*, 46 Fed. Reg. 32,257 (1981). *See also I.C.C. Report to Congress*, 11–12.

## II. DISCUSSION

Santa Fe's arguments in this case may be summarized as follows: Because TOFC service has been deregulated, common law liability restrictions imposed upon common carriers are irrelevant. Likewise, § 10730 is inapplicable to CO–OP's deregulated shipment. The contract between CO–OP and Santa Fe is the only thing which affects the latter's liability for the damaged shipment, and the contract clearly provides that liability is to be limited to the released rate of $.35 per pound. The parties' contract satisfies the requirements of § 10505(e) by providing that full liability rates ("terms consistent with § 10707") are available upon the shipper's request—a request CO–OP never made. Thus, Santa Fe

---

**5.** The first two subsections of section 10101a explain that:

> In regulating the railroad industry, it is the policy of the United States Government—
>   (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportaion by rail;

>   (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required....

is entitled to summary judgment limiting its liability to the released rate.

We disagree with each of these premises.

■ In the first place, the deregulation of TOFC service has not changed Santa Fe's status as a common carrier. Santa Fe claims that "common carrier obligations are created and governed by statute," but this claim is belied by the fact that railroads were deemed to be common carriers long before any statutes or government regulations related to them were enacted. Rather, common carriers are such because of the nature of their business, not because of the existence of any statutory or regulatory duties.

■ Santa. Fe argues that its business has in fact changed with deregulation, in that it is now free to deal or refuse to deal with whomever it chooses. Indeed, one definition of "common carrier" is one that "undertakes to carry for all people indifferently." *National Association of Regulatory Utility Commissioners v. F.C.C.*, 525 F.2d 630, 641 (D.C.Cir.1976), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).[6] Because Santa Fe now has the freedom "to make individualized decisions, in particular cases, whether and on what terms to deal," *id.*, Santa Fe claims that it is relieved of its common carrier status. This argument is not persuasive. Another definition of "common carrier" is simply one "whose occupation or business is transportation of persons or things for hire or reward," *Black's Law Dictionary*, 194 (5th ed. 1979), and it is this meaning that Congress and the Supreme Court have attributed to railroads. The Supreme Court discussed the status of railroads that enter into "special contracts" in *Railroad Co. v. Lockwood*, 84 U.S. (17 Wall.) 357, 21 L.Ed. 627 (1873):

> It is argued that a common carrier, by entering into a special contract with a party for carrying his goods or person on modified terms, drops his character and becomes an ordinary bailee for hire, and,

therefore, may make any contract he pleases. That is, he may make any contract whatever, because he is an ordinary bailee; and he is an ordinary bailee because he has made the contract.

We are unable to see the soundness of this reasoning. It seems to us more accurate to say that *common carriers are such by virtue of their occupation, not by virtue of the responsibilities under which they rest....* The common law subjects the common carrier to insurance of the goods carried, except as against the act of God or public enemies.... And if by special agreement the carrier is exempted from still other responsibilities, it doës not follow that his employment is changed, but only that his responsibilities are changed. The theory occasionally announced, that a special contract as to the terms and responsibilities of carriage changes the nature of the employment, is calculated to mislead. The responsibilities of a common carrier may be reduced to those of an ordinary bailee for hire, whilst the nature of his business renders him a common carrier still....

A common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accomodation or special engagement, he undertakes to carry something which it is not his business to carry.... *But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade*, and the carriage of the articles is embraced within the scope of its chartered powers, *it is a common carrier, and a special contract about its responsibility does not divest it of the character.*

*Id.* (17 Wall.) at 376–77, 21 L.Ed. 627 (emphasis added). Congress too has applied this meaning of "common carrier" to railroads. In the definitions section of the

---

6. This case deals with the definition of "common carrier" for purposes of the Communications Act of 1934, and accordingly is not completely applicable to the status of railroads and other cargo carriers under the common law.

Act, Congress recognizes that the term "carrier" includes both common carriers and contract carriers, but places all rail carriers into the former category. 49 U.S.C. § 10102(2), (4) and (6). Thus, we find that the deregulation of TOFC/COFC service did not alter Santa Fe's status as a common carrier.

The parties' dispute about Santa Fe's common carrier status is all rather academic because, deregulation notwithstanding, TOFC carriers are still subject to the Act's liability provisions. Santa Fe concedes that § 11707 applies to it (at least to some extent), but argues that it is no longer governed by § 10730. Santa Fe asserts that:

> The ICC exempted TOFC shipments from the Interstate Commerce Act which includes 49 U.S.C. § 10730. Moreover, by its clear language 49 U.S.C. § 10730(c) states that this section only applies to rail carrier "service or transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of [Title 49]" which is the Interstate Commerce Act. Accordingly, the requirements of § 10730 did not apply to CO-OP's deregulated shipment....

■ The flaw in Santa Fe's reasoning is that it overstates the breadth of the I.C.C. exemption. As already explained, § 10505(e) states that no exemption order issued by the I.C.C. may relieve a rail carrier of the duty to provide contractual liability terms consistent with the provisions of § 11707. Section 11707(c)(1) and (4), set forth in footnote 2 above, declares that a common carrier may limit its liability only as provided in § 10730; any other limitation of liability is void. Therefore, because § 11707 expressly incorporates § 10730, the latter provision (as well as the former) applies even to deregulated rail carrier service.

■ The I.C.C. interprets the relationship of §§ 10505, 11707 and 10730 the same way: "49 U.S.C. § 11707 imposes, on the carrier, liability for actual loss or injury to property shipped unless released rates under 49 U.S.C. § 10730 are involved." *Ex*

*Parte No. 230 (Sub-No. 5) Improvement of TOFC/COFC Regulation,* 46 Fed.Reg. 32,-257 (1981). Congress has committed to the I.C.C.'s discretion the matter of whether to permit or prohibit different types of liability limitations, *Shippers National Freight Claim Council, Inc. v. I.C.C.,* 712 F.2d 740, 748 (2d Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984), so its interpretation of this question is entitled to deference from this Court. *See also Household Goods Carriers' Bureau v. I.C.C.,* 584 F.2d 437, 441 (D.C.Cir. 1978). In any event, we agree with the I.C.C.—§ 10730 *does* apply to exempted shipments such as the one in this case.

Given the applicability of § 10730, we must next determine whether the parties' agreement satisfies this statutory provision. As the I.C.C. explained in its clarification of the TOFC/COFC exemption order, "[r]eleased rates under 49 U.S.C. § 10730 are at the election of the shipper as an *alternative* to *otherwise applicable full liability rates.*" *Ex Parte No. 230 (Sub-No. 5) Improvement of TOFC/COFC Regulation,* 46 Fed.Reg. 32,257 (1981) (emphasis added). This is consistent with its previously stated position that released rates may not be automatic, but must involve some affirmative act by the shipper. For example, in *Ex Parte No. MC–98 (Sub-No. 2), Released Rates in Conjunction with a Small Shipments Tariff,* 361 I.C.C. 405 (1979), the I.C.C. ruled:

> We agree with the majority that releasing rates ought not to be automatic. The shipper who deliberately signs for released rates is less likely to release the value by mistake than is the shipper whose shipments are subject to released value unless he or she indicates full liability is desired. An accidental release of value could be catastrophic, whereas higher full value rates may be more easily absorbed.
>
> *        *        *        *        *        *
>
> Shippers must be able to choose the transportation service which most closely conforms to their needs. A released rates provision can add flexibility to

**794**

rates and services. However, if the release is automatic, the flexibility of the system could be illusory....

361 I.C.C. at 416, 417.

The courts also have held that a carrier cannot limit its liability automatically or by implication. Instead, "[t]here must be an absolute, deliberate and well-informed choice by the shipper." *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 108 (1st Cir.1978). As the Second Circuit stated,

> To permit a carrier, without any action whatever by the shipper in respect to valuation in writing, to limit its liability on the basis of declared or released value on which the rate was charged would be to ignore entirely the statutory requirement that the shipper must make the declaration or agreement in writing....

*Caten v. Salt City Movers & Storage Co.,* 149 F.2d 428, 432 (2d Cir.1945).

Santa Fe does not dispute CO–OP's assertion that § 10730 requires some type of written release by the shipper before a carrier's limitation of liability is effective.[7] Indeed, Santa Fe used a written release procedure before deregulation. Unless the shipper signed a released value statement on the shipping order and bill of lading, full liability rates applied. However, Santa Fe did not follow such a procedure in this case, apparently believing that it no longer needed to do so after the I.C.C.'s exemption order.

■ Santa Fe argues that CO–OP agreed to a released rate for its shipment because of the inclusion in the parties' contract of Item 52 of ATSF Circular No. TOFC–1. Item 52 provides that Santa Fe's liability for loss or damage "shall be subject to released values" as established by Santa Fe. Thus, the application of released rates is automatic. According to Santa Fe, CO–OP could have obtained full liability only by proceeding under item 57 of Circular No. TOFC–1. Item 57 purports to offer terms consistent with 49 U.S.C. § 11707,

"[a]s an alternative to terms for claims and liability for loss or damage."

The problem with this contractual scheme is that it reverses the assumption of liability required by §§ 10730 and 11707. Santa Fe is offering full liability rates, but only as an alternative to otherwise applicable released rates. The automatic nature of Santa Fe's limitation of liability is precisely the "trap for the unwary" that the I.C.C. has refused to allow by requiring carriers to obtain a deliberate release from the shippers. Accordingly, Items 52 and 57 do not comply with §§ 10730 and 11707, and they are unenforceable. 49 U.S.C. § 11707(c)(1); *see also Fruitco Corp. v. Consolidated Rail Corp.,* 118 Misc.2d 1090, 462 N.Y.S.2d 754, 757 (N.Y.Cir.Ct. 1983).

■ Even if Items 52 and 57 conformed to the Act, there is a second reason why they should not be enforced here: they are inconsistent with another contractual provision which also seems to apply to this matter. Item 56 of Circular No. TOFC–1, entitled "RELEASED VALUE RATES," provides:

> If rate circular quotes "released value rates," transportation at such rates is subject to all the terms of this offer except that such rates are based upon a maximum value of the lading per hundred pounds in the amount stipulated in the rate circular. Released value rates will be applicable only if the Shipping Order is endorsed by consignor, before its receipt by ATSF; "RELEASED VALUE SHIPMENT: RELEASED VALUE $_____ cwt," and released value amount must be inserted by consignor. Recovery for delay, loss, or damage to lading will be governed by the rules herein but in no event will payment by ATSF exceed released value amount.

Thus, although Item 52 provides that released rates apply automatically, Item 56 provides that they "will be applicable only

---

7. Santa Fe simply contends that § 10730 no longer applies to it, an argument we have already rejected.

 

if the Shipping Order is endorsed by consignor."

Santa Fe unconvincingly attempts to explain how Items 52 and 56 are not contradictory. Essentially, Santa Fe claims that Item 52 applies only to shipments for which released rates have been published already, while Item 56 applies only in cases in which the shipper must obtain a special released rate quotation. This makes no sense, however, in light of Item 56's reference to released value rates in a *rate circular*. All of Santa Fe's established released rates, including the one Santa Fe claims applies to CO–OP, are included in a rate circular, so Item 56 appears to apply to all of them.[8]

The conflict between Items 52 and 56 renders the parties' contract confusing and ambiguous. Under standard rules of contract interpretation, any ambiguity must be construed against Santa Fe, which drafted the contract. *E.g., Chicago & North Western Railway Co. v. Hunt-Wesson Foods, Inc.,* 504 F.2d 905, 908 (7th Cir.1974); *The Atchison, Topeka & Santa Fe Railway Co. v. United States,* 572 F.2d 843, 849, 216 Ct.Cl. 54 (1978). Thus, Item 52 cannot be considered to be the only provision governing released rates in this case and should not be enforced.[9]

Finally, CO–OP claims that it is entitled to recover costs, fees and interest under Item 37 of Circular No. TOFC–1. However, we agree with Santa Fe that Item 37 is intended to apply only to suits initiated by Santa Fe for the collection of freight charges from shippers or consignees, not to actions such as this one brought by a shipper for damages. Santa Fe "readily admits that CO–OP is entitled to a refund of any freight charges paid to Santa Fe for the shipment which was derailed and damaged," and we find that CO–OP may not

base a claim for any other costs, fees or interest on Item 37.

In sum, we find that Santa Fe is liable to CO–OP for the full actual cost of the damaged goods, but CO–OP may not recover court costs, attorney's fees or interest. Accordingly, Santa Fe's motion for summary judgment is denied, and CO–OP's motion for summary judgment is granted in part and denied in part. It is so ordered.

---

**8.** Item 56 might better be explained as a vestige of Santa Fe's former procedure of obtaining a shipper's written release in all cases. As noted above, Santa Fe abandoned this procedure too quickly.

**9.** Santa Fe claims that CO–OP should not be allowed to complain now about the contract's confusion because it failed to raise the liability

issue with Santa Fe before entering the agreement. However, we agree with CO–OP that CO–OP acted reasonably in assuming that the procedure followed before deregulation was still in effect. Moreover, the fact that the parties did not previously discuss the issue of liability shows the lack of a deliberate, affirmative release as required by § 10730.