QUASAR COMPANY, A DIVISION OF MATSUSHITA ELECTRIC CORPORATION OF AMERICA, Plaintiff,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY and Devco Distribution Systems, Defendants.

No. 83 C 4617.

United States District Court, N.D. Illinois, E.D.

March 31, 1986.

John Maniatis, Ray, Robinson, Hanninen & Carle, Chicago, Ill., for plaintiff.

John C. Palmer, Jr. and Ellen L. Falkof, Atchison, Topeka and Santa Fe Railway Corp., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

It all started with what looked like a simple discovery request. Plaintiff Quasar Company (Quasar) wanted documents and answers to interrogatories which would relate to the degree of defendant Atchison, Topeka and Santa Fe Railway's (Santa Fe's) negligence in the theft of a shipment of Quasar's video cassette recorders from a Santa Fe yard. This court granted Quasar's motion to compel. *Quasar Co. v. Atchison, Topeka and Santa Fe Railway Co.*, No. 83 C 4617 (N.D.Ill. July 30, 1985) [Available on WESTLAW, DCTU database]. Santa Fe rapidly returned asking us to reconsider, asserting that our "decision to consider a rail carrier's degree of negligence in a freight loss and damage case [was] the first such holding since the early 1900s." It argues that we relied on Illinois law in an area in which federal law long ago preempted state law.

Santa Fe is correct; we were wrong and we reverse our July 30 order. The question proves to be substantially more complex than either its appearance or the party's briefs initially led us to believe. We went astray in part because the problem is new: a question of what to do with old rail carrier laws and regulations when a service is suddenly deregulated. But the unusual arguments the parties made also helped us get off-track. In the hope that we may not be similarly misled in the future, we take some time and space for discussion of the law which should govern this suit.

## I.

The facts which led to this lawsuit are set out in this court's first memorandum and order in this case, *Quasar Co. v. Atchison, Topeka and Santa Fe Railway Co.*, No. 83 C 4617, slip op. (N.D.Ill. Feb. 17, 1984) [Available on WESTLAW DCTU database] The VCRs were in a cargo container en route from Japan to Chicago. An ocean carrier, Sea-Land Services, Inc., issued a through bill of lading in Japan and shipped the container to Los Angeles. There, defendant Devco Distribution Systems (Devco), which Quasar had hired, transferred the container to Sante Fe for rail carriage to

Chicago. The container vanished from Santa Fe's Los Angeles yard the next day.

Santa Fe has admitted liability, so the only question in this case is the amount of damages Santa Fe must pay Quasar for the stolen shipment of VCRs. When Devco delivered the container, Santa Fe issued an interchange receipt which carried a computer overprint to the effect that rights, duties and liabilities "are governed by ATSF circular no. TOFC–1." Section 52 of that circular states that liability for loss or damage "shall be subject to released values as established by ATSF." Santa Fe asserts that the released value it has established is $1.50 per pound, and so its liability is limited to $36,504. Quasar states that the actual value of the shipment was $450,000. It argues, as one would expect, that the claimed liability limitation does not apply to it, and has offered several legal theories which it believes would support that result. This court discussed most of these in its February 17 memorandum, in which we found that Quasar had at least stated a claim and denied Santa Fe's motion to dismiss.

Quasar's motion to compel (which led to the July 30 order), however, was grounded on yet another theory. Quasar argued there that if it could show gross negligence in the security arrangements at Santa Fe's Los Angeles yard, the liability limitation would be void. Therefore, it maintained, the issue of gross negligence was relevant to the suit. It asked for discovery designed to ferret out gross negligence.

### A.

Under interstate common carrier law for most of this century Quasar's position would have had no basis. The system of liability for common carriers, firms in the business of providing carrier service to the public, differs sharply from ordinary tort or contract liability. A private carrier, one who has specially agreed in a particular instance to transport goods or persons but who does not hold himself out to the public as a carrier, is subject to liability for failure to use ordinary care. But in the system of common carrier liability, at least until recently, a common carrier's negligence was not relevant because it was implicitly assumed. At common law a common carrier was liable for loss or damage to a shipper's goods as an insurer would be: liable for the full value of the goods unless the loss was caused by an act of God, the public authority, a public enemy, the shipper, or by an inherent vice in the goods. The shipper and the carrier could, however, contractually agree that the carrier's liability would be limited to a specific amount if the shipper received in consideration a lower rate for the carriage. These principles, in the main, were carried over into the Interstate Commerce Act. The basic rule was that the carrier was liable for the full value of goods lost or damaged. However, if authorized by the Interstate Commerce Commission (ICC), a carrier could offer "released value rates": the shipper "released" the goods at a certain value and in return the carrier gave the shipper a lower rate. The shipper thus became in effect a coinsurer of his goods. If lost or damaged, his recovery was limited to the released value. *See generally Shippers National Freight Claim Council, Inc. v. I.C.C.*, 712 F.2d 740, 745–748 (2d Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984); *Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1156–1157 (3d Cir.), *cert. denied* 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980).

In the regime of released value rates, what governs the size of a recovery is not the degree of the carrier's negligence but rather the validity of the contract term for the released value. If a liability limitation is valid, recovery cannot exceed the released value no matter how negligent the carrier was. *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 57 S.Ct. 73, 81 L.Ed. 20 (1936). Most courts have found, for example, that a liability limitation is unaffected by a breach of an essential term of the contract, *Conoco, Inc. v. Andrews Van Lines, Inc.*, 526 F.Supp. 720 (W.D.Okla.1981), gross negligence, *Tishman & Lipp, Inc. v. Delta Airlines,*

275 F.Supp. 471, 480 (S.D.N.Y.1967), *aff'd* 413 F.2d 1401 (2d Cir.1969), or even willful conduct by the carrier's employees, *Neal v. Republic Airlines, Inc.,* 605 F.Supp. 1145, 1149 n. 3 (N.D.Ill.1985). It matters not, apparently, whether the goods were stolen, either while in transport or while being stored, *Western Transit Co. v. A.C. Leslie & Co.,* 242 U.S. 448, 37 S.Ct. 133, 61 L.Ed. 423 (1917), even if an employee of the carrier stole them, *Tishman,* 275 F.Supp. at 480, indeed not even if an employee of the carrier deliberately set fire to them, *Rocky Ford Moving Vans, Inc. v. United States,* 501 F.2d 1369, 1373 (8th Cir.1974) (*dictum* ).

On the other hand, if there is no valid liability limitation, then the shipper recovers by simply proving delivery to the carrier in good condition and arrival in bad condition (or no arrival at all), unless the carrier can prove one of the traditional exceptions. *Missouri Pacific Railroad Co. v. Elmore & Stahl,* 377 U.S. 134, 137–138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). In neither case, then, does the carrier's conduct affect the outcome. Thus, if that system of liability applies here, defendants' gross negligence would indeed not be relevant and discovery on that subject would properly be denied.

**B.**

What was not clear to us, however, at the time of Quasar's motion was whether the transaction here comes under that system of liability. Because the VCRs were inside a container, the loss comes under a newly murky area of the law. The Interstate Commerce Commission exempted trailer on flatcar (TOFC or "piggyback") and container on flatcar (COFC) services from federal economic regulation in 1981. 46 Fed.Reg. 14348 (1981). The exemption came pursuant to authority granted by Congress, codified at 49 U.S.C. § 10505 as part of the Staggers Rail Act of 1980. Congress expressly encouraged an exemption for services which were "part of a continuous intermodal movement," a category which includes TOFC/COFC. 49

U.S.C. § 10505(f), 49 C.F.R. § 1090.1. *See generally American Trucking Ass'ns v. I.C.C.,* 656 F.2d 1115 (5th Cir.1981). As one feature of deregulation, railroads no longer need publish nor file with the I.C.C. rates applicable to TOFC/COFC services. *Id.* at 1124; 46 Fed.Reg. at 14349. The question then becomes whether deregulation means that railroads, when transporting goods by TOFC/COFC, are required to comply with any portion of the Interstate Commerce Act.

Santa Fe's position on the subject is astoundingly simple. It maintains that thanks to deregulation it is no longer a common carrier when performing TOFC/COFC services. Exemption frees it from any and all terms of the Interstate Commerce Act and makes it a private carrier. It therefore incurs liability only insofar as it expressly contracts for it, it says, and so cannot be liable for more than the $1.50 per pound it has established for itself. Santa Fe thus did not raise the issue of federal preemption in its response to Quasar's motion to compel; indeed, it argued little except the pleadings. Since Quasar did not allege gross negligence as a basis for recovery in its complaint, defendants said, gross negligence was not relevant. Unfortunately, Quasar's brief was no more helpful, merely citing two Illinois cases from the 1890s, a California case dealing with intrastate carriage and a fairly recent Canadian case, all for the proposition that a carrier cannot contract out of its own gross negligence.

Ordinarily a court should decide questions on the issues the parties present to it, rather than on an issue neither party has briefed. *See Williams v. City of St. Louis,* 783 F.2d 114, 116 (8th Cir.1986). Presented with two unusual arguments, this court chose a point where they might be reconciled. If deregulation meant that carriers were no longer subject to the Interstate Commerce Act, it was not unreasonable to turn the legal clock back to common law principles which were developing before that Act was passed and which apparently had continued to develop else-

where. *See Quebec Liquor Corp. v. Owners and Charterers of the Vessel Dart Europe,* 1979 Am.Mar.Cas. 2382, 2385 (Fed.Ct. Ottawa, Ont., Can. 1979). And if Santa Fe was now not a common carrier, but a private carrier, its degree of negligence could well be relevant to the amount of recovery. *See* 13 Am.Jur.2d 565 (1964). The question before us was after all discovery, not liability, and the confusion could be resolved at a later time (with, hopefully, better briefs).

Now, however, Santa Fe has raised an argument of federal preemption. It maintains that we cannot rely on the state law decisions which we cited in our July 30, 1985 memorandum granting the motion to compel because a carrier's liability for goods carried interstate is wholly a matter of federal law. *American Railway Express Co. v. Levee,* 263 U.S. 19, 44 S.Ct. 11, 68 L.Ed. 140 (1923); *Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913).

Certainly this court recognizes that where the I.C.C. has exercised its authority to regulate, then not only state statutes and regulations but also state common law principles are preempted insofar as they conflict with the federal regulation. *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). The case at bar, however, is not so simply resolved. Perplexingly, it presents an instance where the I.C.C. has chosen not to regulate. Further, Santa Fe's arguments, taken together, apparently place it under no law at all. It is not bound by state law, it says, because preemption makes carrier liability a matter of federal law. Yet it is not bound by federal law either, because deregulation has released it from the Interstate Commerce Act. Whatever the intent of Congress in passing the Staggers Act, this court does not think it intended to make each railroad a sovereign, free to make its own law. Quasar, however, rests on its original argument. This court concludes, then, that to decide this question it will need to go beyond the briefs of the parties. We proceed to a search for the source of the law which will govern this case.

## II.

Within constitutional limits, federal preemption of state law is found where Congress has explicitly expressed its intent to preempt, *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), or where the nature and object of the federal laws and regulatory scheme show Congress' intent to occupy the whole field, *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961). Further, even where Congress has not entirely displaced the states in an area, state law will be preempted where it conflicts with federal law, i.e., where it is physically impossible to comply with both laws or where the state law is an obstacle to the purposes and objectives of the federal law. *Michigan Canners and Freezers Ass'n v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984). *See generally Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 203–204, 103 S.Ct. 1713, 1721–1722, 75 L.Ed.2d (1983). Since the regulations of a federal agency have the force of law, they too can preempt state law. The same analysis is applied to determine whether they have in fact preempted it. *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

There seems little doubt that, at least until deregulation, federal law controlled all questions of interstate carrier liability and preempted any state law that might otherwise have been applicable. For example, the Supreme Court has twice held that state laws which would have invalidated an agreement and allowed a shipper to recover more than the released value were preempted by federal law. *Levee,* 263 U.S. at 21, 44 S.Ct. at 12; *Galveston, Harrisburg & San Antonio Railway Co. v. Woodbury,* 254 U.S. 357, 41 S.Ct. 114, 65 L.Ed. 301 (1920). Most courts faced with

the question also concluded that federal law is the sole source of remedies for shippers, preempting, for example, any state common law action for negligence. *See, e.g., Fulton v. Chicago, Rock Island & Pacific Railroad Co.,* 481 F.2d 326, 331–332 (8th Cir.), *cert. denied* 414 U.S. 1040, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973); *W.D. Lawson & Co. v. Penn Central Co.,* 456 F.2d 419 (6th Cir.1972).[1]

The question is whether state law principles are still preempted from application to TOFC/COFC services now that they have been deregulated. There may be room for state regulation of certain aspects even of an area which is tightly controlled by federal law, *see Pacific Gas,* 461 U.S. at 216, 103 S.Ct. at 1728 (nuclear energy), including regulation of rates charged for a commodity traveling in interstate commerce, *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (electricity). Congress can act to authorize the use of state law in an area otherwise preempted, *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System,* 472 U.S. ——, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), and agency regulations can be construed as showing an intent not to preempt state law in an area within the agency's authority. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. ——, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Either Congress or the I.C.C. thus could, at a stroke, give state law a role in interstate carrier liability which it has not had for seventy to eighty years.

On reconsideration, however, and now that Santa Fe has raised the issue, it does not appear that TOFC/COFC deregulation was that stroke. Congress, in the same section of the Staggers Act which provided for deregulation, also provided that no exemption order would or could relieve a rail-road from its liability obligations imposed by the liability provisions of the Interstate Commerce Act. 49 U.S.C. § 10505(e). The I.C.C., in its exemption order, expressly retained jurisdiction over TOFC/COFC services. 46 Fed.Reg. at 14349–14350. These actions must be read in light of the expressed intention of Congress to preempt conflicting state law for all matters covered by the Interstate Commerce Act or within the jurisdiction of the I.C.C. 49 U.S.C. § 10501(c)(2). The purpose of deregulation was to make railroads more competitive in interstate freight carriage. To achieve that purpose, a uniform national policy is required. If state law were to apply to carrier liability, liability would be different in different states. That would be an obstacle to Congress' current purposes and objectives, just as it was to the former ones. *See Adams Express,* 226 U.S. at 507–508, 33 S.Ct. at 152–153; *cf. Kalo Brick,* 450 U.S. at 324–327, 101 S.Ct. at 1133–1135.

■ This court concludes that federal law still preempts state law in the area of carrier liability for interstate TOFC/COFC services. Insofar as our previous order rested on state law, then, it cannot stand.

## III.

■ It does not follow, however, that Santa Fe's liability is under no law at all. The statutory and regulatory grounds for finding preemption are also grounds for finding that a deregulated rail carrier remains under the law of the Interstate Commerce Act, at least for issues of liability.

In the first place, this court thinks that liability for TOFC/COFC services is still covered by the Act. The statute authorizing deregulation also expressly imposed on the deregulated carrier "an obligation to provide contractual terms for liability and claims which are consistent with the provi-

---

1. Two 10th Circuit cases which held that state law negligence actions were still an option, *Reed v. Aaacon Auto Transport, Inc.,* 637 F.2d 1302 (10th Cir.1981), and *Litvak Meat Co. v. Baker,* 446 F.2d 329 (10th Cir.1971), both rest on a clause in the former 49 U.S.C. § 20(11), "noth-ing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law," which no longer appears in the Interstate Commerce Act as recodified in 1980.

sions of section 11707 of this title." 49 U.S.C. § 10505(e). The ICC continues to issue regulations on carrier liability for deregulated services. 46 Fed.Reg. 32257 (1981). We read these congressional and ICC actions to mean that TOFC/COFC liability is still directly governed by the terms of the statutes and ICC regulations.

Santa Fe argues that the statutory language leaves room for its interpretation that for TOFC/COFC services it is a private carrier not subject to the statute. Congress' order to provide "terms ... consistent with" the Act is not the same thing as placing carriers directly under the Act. As long as Santa Fe has provided, among its array of offerings to shippers, a set of contractual terms consistent with the Act, it has, it believes, fulfilled its literal obligation under the statute. It maintains that its liability is a private contractual matter.

Even if the Act's literal coverage of TOFC/COFC services is in doubt, however, the doubt would not change the result. To the extent that losses from a deregulated portion of interstate freight carriage would not be directly governed by statute, they would be controlled by federal common law which is drawn from the statutes. *First Pennsylvania Bank, N.A., v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1117, 1122 (3d Cir.1984) (air freight deregulation).

Federal courts have the power to develop remedies which are outside the precise scope of what has been prescribed by Congress by drawing on federal common law. *Illinois v. City of Milwaukee,* 406 U.S. 91, 103, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1972). The use of federal common law is particularly appropriate where, as here, the question falls in an area where federal law has preempted state law, *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942), and federal policy dictates a need for uniformity throughout the nation, *United States v. Yazell,* 382 U.S. 341, 354, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966). Federal common law is also properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute, but

the use of common law will fill gaps in the congressional statutory pattern or otherwise make that pattern effective. *United States v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973). Thus common law principles have long been used to fill gaps in or supplement the Interstate Commerce Act. *See Elmore & Stahl,* 377 U.S. at 137, 84 S.Ct. at 1144; *Missouri Pacific Railroad Co. v. Porter,* 273 U.S. 341, 345, 47 S.Ct. 383, 384, 71 L.Ed. 672 (1927); *Southern Express Co. v. Byers,* 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825 (1916); *Cudahy Packing Co. v. Munson Steamship Line,* 22 F.2d 898 (2d Cir.1927), *cert. denied* 277 U.S. 586, 48 S.Ct. 433, 72 L.Ed. 1000 (1928). Therefore, when a question of the liability of a carrier falls outside statutory coverage, rather than leave the shipper without a remedy courts have turned to federal common law. *First Pennsylvania,* 731 F.2d at 1115–1118; *cf. Strachman v. Palmer,* 177 F.2d 427 (1st Cir.1949).

The principal source for federal common law is the policy indicated by the federal statutes themselves. A court looks at the policy underlying the legislation and fashions a remedy which will effectuate that policy. *Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456–457, 77 S.Ct. 912, 917–918, 1 L.Ed.2d 972 (1957). The sources for a common law remedy in a carrier liability case, then, would be the statutes which cover the liability of carriers in similar situations. They are the expression of federal policy on which an appropriate remedy can be built. *See Elmore & Stahl,* 377 U.S. at 137, 142 n. 15, 84 S.Ct. at 1144, 1147 n. 15; *Porter,* 273 U.S. at 345, 47 S.Ct. at 384; *Cudahy,* 22 F.2d at 901. Thus even if the statutes do not apply to a deregulated service, a question of the enforceability of a released value liability limit in a contract for such service will nevertheless be determined from the general principles of released value rates doctrine found in the statutes and the cases construing them. *First Pennsylvania,* 731 F.2d at 1122 (released value rates liability principles ap-

plied to deregulated air freight).[2] We need not decide, therefore, the precise extent to which deregulation released Santa Fe from the Act. If its liability is not governed directly by the statutes it is governed by federal common law which derives from the statutes.

The impact of deregulation of TOFC/COFC services on carrier liability, then, is significantly less than Santa Fe would have us believe. Most importantly, Santa Fe has not become a law onto itself. It still holds itself out to the public as a provider of TOFC/COFC carrier services, and so is still a common carrier subject to the federal law of liability for common carriers. *Co-Operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Railway Co.*, 613 F.Supp. 788, 792–793, *further proceeding* 624 F.Supp. 797 (N.D.Ill.1985).[3] Further, the federal law for TOFC/COFC carrier liability is still fundamentally the law of interstate carrier liability in general. As this court noted above, and also in its first (February 17) memorandum, 49 U.S.C. § 10505(e) directs one to the Act's provisions for liability under receipts and bills of lading at 49 U.S.C. § 11707. That section in turn requires in essence that a carrier be liable for the actual value of lost or damaged property, § 11707(a)(1), unless the shipper has accepted a limited liability by agreeing to a released value rate, § 11707(c)(4). The latter section incorporates 49 U.S.C. § 10730, which allows a rail carrier to offer released value rates which limit liability, but only if the shipper has declared the released value in writing or a written agreement for the released value

exists between shipper and carrier. The I.C.C. construes these provisions to mean that a TOFC/COFC carrier is not exempted from liability for actual loss or injury unless the shipper has elected released value rates, in which case the carrier is liable for the released value. 46 Fed.Reg. at 32257. This court therefore held in our first memorandum that the liability provisions of the Interstate Commerce Act still apply to TOFC/COFC services despite deregulation. *Quasar*, No. 83 C 4617, slip op. at 6–7 (N.D.Ill. Feb. 17, 1984). The other courts which have considered the question agree. *American Trucking*, 656 F.2d at 1124; *Co-Operative*, 613 F.Supp. at 793. In short, deregulation did not substantially change carrier liability.

■ The essential system has not changed and that system does not consider a carrier's gross negligence to void the liability limitation of a released value rate. This court therefore now sees no basis either as a matter of statutory construction or of federal common law for considering the degree of the carrier's negligence relevant to the case at bar. Our second (July 30) order granting Quasar's motion to compel was in error and must be reversed.

### IV.

This court notes in passing, however, for the benefit of the parties and our own files, that deregulation may have made a small but significant change in the factors which affect the validity of a liability limitation. In the old regime, which apparently still applies outside deregulation, the burden of

---

**2.** This court notes that the concept of drawing on the statutes to fashion a common law remedy, utilized here to show that in spite of deregulation Santa Fe is still under federal law, may apply to this case in another way. The Interstate Commerce liability provision, 49 U.S.C. § 11707, is apparently so worded as not to apply to goods shipped from a non-adjacent foreign country on a through bill of lading. This court's February 17, 1984 order in this case discussed, without deciding, the problems raised for purposes of statutory coverage when, as here, goods are shipped on a through foreign bill of lading but also a domestic interchange receipt. Even if the receipt does not bring this

case within the Act, however, Quasar may still have a claim for its loss at federal common law.

**3.** This case, which also involves a shipper's loss from a TOFC service in the period of deregulation, was decided by Judge Aspen of this district on July 3, 1985. This court's order on Quasar's motion to compel did not issue until July 30, 1985. Neither party in the case at bar has ever brought *Co-Operative* to our attention, not for purposes of the motion to compel nor for this motion to reconsider. This court notes that Santa Fe, defendant here, was also the defendant in *Co-Operative*.

avoiding a released value rates liability limitation tended in practice to be on the shipper. Santa Fe, apparently as an alternative to its stand that no law applies to it, continues to cite these cases as controlling here. In the era of deregulation, however, courts are beginning to require that contracts be structured so that the released value rate applies only if a shipper affirmatively chooses it.

The standard practice for decades has been that a carrier could stipulate a liability, usually in terms of a figure per pound, and the shipper would be bound unless he affirmatively declared a greater value. *American Railway Express Co. v. Daniel,* 269 U.S. 40, 46 S.Ct. 15, 70 L.Ed. 154 (1925). In general, the courts applied the maxim that silence means consent. Leaving the space for value on the bill of lading blank was considered to be a declaration that the value did not exceed the amount stipulated by the carrier. *Wells, Fargo & Co. v. Neiman-Marcus Co.,* 227 U.S. 469, 33 S.Ct. 267, 57 L.Ed. 600 (1913); *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.,* 596 F.Supp. 515 (E.D. Pa. 1983). If the shipper accepted a bill of lading or receipt, he implicitly assented to the stipulated rate even if he didn't sign anything. *American Railway Express Co. v. Lindenburg,* 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414 (1923); *see also Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261 (8th Cir.1984) (carrier's error in recording declared value balanced by shipper's acceptance of bill of lading and carriage at released value rate). The few cases which allowed a shipper to escape a liability limitation involved situations where the bill of lading offered no space where the shipper could declare a higher value, *Caspe v. Aaacon Auto Transport, Inc.,* 658 F.2d 613 (8th Cir.1981), or where the shipper never saw the bill of lading, *Cordingley v. Allied Van Lines, Inc.,* 413 F.Supp. 1398 (D.Mont. 1976), *aff'd* 563 F.2d 960 (9th Cir.1977), or a receipt or bill of lading was never even issued. *New York, New Haven & Hartford Railroad Co. v. Nothnagle,* 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953);

*Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103 (1st Cir.1978).

The courts could tolerate these seemingly harsh results because the rates were published and on file with the I.C.C. The generally applicable standard for validity of a released value agreement is laid out in this court's first (February 17, 1984) memorandum in this case. A shipper must be given a fair opportunity to choose between higher and lower liability. A fair opportunity means that the shipper had both reasonable notice of the liability limitation and the chance to make a deliberate and well-informed choice. *Quasar,* No. 83 C 4617, slip op. at 8 (N.D.Ill. Feb. 17, 1984), and cases cited there. The regulatory process itself, however, took care of most of these steps in the eyes of many courts. Regulation required filing and publication of tariffs. All persons can fairly be charged with notice of and knowledge of matters on public record. Therefore, a shipper was presumed to know the carrier's tariffs. *Daniel,* 269 U.S. at 42, 46 S.Ct. at 15–16; *Kansas City Southern Railway Co. v. Carl,* 227 U.S. 639, 652–653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913). If the carrier stipulated the value and made the released value rate primary, the shipper should know that. If the shipper failed to act, presumably it was because he deliberately accepted the released value and the released value rate. *Lindenburg,* 260 U.S. at 591–592, 43 S.Ct. at 209; *First Pennsylvania,* 731 F.2d at 1117.

When the reason for the rule ceases, however, so should the rule. With deregulation, rates for TOFC/COFC services are no longer required to be either published or filed. A shipper therefore no longer can be charged with knowledge of the rate structure. A system which binds the shipper to limited liability unless he takes the first step, then, no longer seems appropriate.

At a minimum, a full value rate for a deregulated service must actually be available so the shipper can make a choice. Otherwise the liability limitation is unenforceable. 46 Fed.Reg. at 32257; *Fruitco Corp. v. Consolidated Rail Corp.,* 118

Misc.2d 1090, 462 N.Y.S.2d 754 (Civ.Ct.N.Y. City 1983). Congress and the I.C.C. strongly suggest more. By statute, a released rate agreement for rail carriage must be in writing. 49 U.S.C. § 10730(c). The I.C.C. believes that released rates should apply only "at the election of the shipper as an alternative to otherwise applicable full liability rates." 46 Fed.Reg. at 32257. When the tariffs are no longer on record, released value rates can no longer be the automatic result of a standard contract. If the system is set up so that the released rate applies unless the shipper acts, shippers will find to their surprise that their recovery is hamstrung by a liability limitation. For the shipper on a deregulated service to have a fair opportunity to choose, the process of contracting for carriage itself must provide the notice and the opportunity for a deliberate and well-informed choice. *Cf. First Pennsylvania,* 731 F.2d at 1123 (shipper no longer on constructive notice of air freight tariff schedules after deregulation). Thus the court in *Co-Operative* found a liability limitation on a TOFC/COFC shipment unenforceable because the system of contracting was set up to produce released value rate shipments unless the shipper demanded full value. 613 F.Supp. at 793–794. For deregulated service full liability rates must be primary and released rates the secondary service shippers get only if they ask for it.

The absence of a gross negligence theory therefore may not be as damaging to Quasar's cause as it appears. Santa Fe appears to rely principally on the reference to its tariffs printed on the interchange receipt as the item which bound Quasar to a liability limitation. When the service was regulated, such a reference probably was enough. *See North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229 (2d Cir.1978). In deregulation, however, validity appears to hinge on the place of the limitation in the entire process of contracting. The court awaits further evidence on that subject.

## CONCLUSION

Defendants' motion to reconsider this court's ruling on plaintiff's motion to compel discovery is granted. The July 30, 1985 order compelling discovery is rescinded and plaintiff's motion to compel discovery is denied.