840 F.2d 447
 CO-OPERATIVE SHIPPERS, INC., Plaintiff-Appellee/Cross-Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,
Defendant-Appellant/Cross-Appellee.
 Nos. 86-1075, 86-1119.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 10, 1986.
Decided Feb. 10, 1988.
 
 John C. Palmer, Jr., The AT & SF RY Co., Chicago, Ill., for defendant-appellant/cross-appellee.
 Joseph M. Roberts, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., for plaintiff-appellee/cross-appellant.
 Before COFFEY and RIPPLE, Circuit Judges, and CAMPBELL, Senior District Judge.*
 CAMPBELL, Senior District Judge.
 In 1980, Congress enacted the Staggers Rail Act, 49 U.S.C. Sec. 10101 et seq. and in doing so "unambiguously expressed its interest in allowing free competition, to the maximum extent possible, to govern the financial health of the railroad industry." ICC v. Texas --- U.S. ----, 107 S.Ct. 787, 793, 93 L.Ed.2d 809 (1987). As part of the Staggers Act, Congress enacted 49 U.S.C. Sec. 10730(c) which states in pertinent part, "A rail carrier ... may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by ... a written agreement between the shipper and carrier...."
 To further promote deregulation of the railroad industry, Congress also enacted 49 U.S.C. Sec. 10505(f) which authorized the Interstate Commerce Commission (ICC) to exempt rail transportation from regulation. Pursuant to this authority, the ICC did exempt rail transportation from regulation. See 46 Fed.Reg. 14,348 (1981); see also ICC v. Texas, 107 S.Ct. at 789. However, Congress still mandates that rail carriers who desire to limit their liability to shippers do so pursuant to 49 U.S.C. Sec. 10505(e) which states:
 No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title. (emphasis added).
 Section 11707, to which section 10505(e) refers provides that a common carrier is liable for the actual loss or injury to property it transports.[1] 49 U.S.C. Sec. 11707(a)(1). However, Sec. 11707(c)(4) states that a carrier "may limit its liability for loss or injury of property transported under section 10730 of this title." Thus, a rail carrier may limits its liability to a shipper if the carrier can satisfy the requirements of section 10730(c) and section 10505(e).
 Our jurisdiction is pursuant to 28 U.S.C. Sec. 1291. For the reasons set forth below, we conclude that the rail carrier before us has satisfied the requirements of section 10730(c) and section 10505(e). Accordingly, the district court's decision is reversed in part, affirmed in part and remanded.
 
 I.
 
 1
 In the present case, The Atchison, Topeka and Santa Fe Railway Company (Santa Fe) defendant/appellant/cross-appellee, a rail carrier, sought to limit its liability to Co-Operative Shippers, Inc. (Co-Op) plaintiff/appellee/cross-appellant. Co-Op is an association of shippers which consolidates the freight of its members and tenders the combined loads to carriers, thereby obtaining for its members the benefit of the carriers reduced transportation rates for volume shipping. Co-Op is managed by Coordinated Traffic Services which received $25 million in revenue in 1983.
 
 
 2
 Santa Fe was contacted in September 1982 by Ronald Salbego, the General Manager for Co-Op's management company. Salbego asked Santa Fe's representative, John Beck, about the possibility of Co-Op entering into a volume contract with Santa Fe. Salbego dep. at 37. Beck forwarded a copy of Santa Fe's volume transportation contract titled "Contract T-116" to Salbego.
 
 
 3
 On November 3, 1982 Co-Op's Assistant Operations Manager Joseph Garrity telephoned Santa Fe's Mr. Beck and requested a change in the terms of the contract. The negotiations concerned Co-Op's quota of trailers per year imposed by Santa Fe in Contract T-116. Salbego dep. at 42. Santa Fe agreed to Co-Op's proposed modification. Co-Op never sought to negotiate the liability terms of the transportation contract. Garrity dep. at 15.
 
 
 4
 Mr. Beck forwarded the changed contract to Mr. Salbego on November 17, 1982 and Salbego executed the contract on November 22, 1982. Contract T-116 states that ATSF Circular TOFC-1 and ATSF Circular No. 7000 are incorporated by reference as terms and conditions governing all trailer-on-flatcar (TOFC) shipments delivered by Co-Op to Santa Fe. Co-Op had received copies of TOFC-1 and Circular 7000 prior to Co-Op's execution of Contract T-116. Salbego dep. at 40.
 
 
 5
 The pertinent provisions in TOFC-1 and Circular 7000 are as follows:
 
 
 6
 ATSF Circular No. TOFC-1
Item Subject Application
----------------------------------------------
 * * *
37 SUIT TO In the event that suit must
 COLLECT be filed to collect any charge
 arising under this contract,
 the amount sued upon shall
 include interest from the date
 of shipment at the maximum
 rate of interest allowed by
 law in the jurisdiction in
 which suit is filed. Court
 costs and reasonable attorney's
 fees shall be added to such
 principal and interest.
 (emphasis added).
 * * *
 
 
 7
 Mr. Salbego relied upon Co-Op's Operations Department, including Mr. Garrity and Mr. James Lyons to review the circulars. Salbego dep. at 40. Garrity reviewed the circulars but he failed to consider the liability or released value terms contained in TOFC-1 and Circular 7000. Garrity dep. at 30. Mr. Lyons also reviewed the circulars prior to the contract's execution but he never sought to determine the liability and released value terms prior to the contract's execution. Lyons dep. at 54.
 
 
 8
 On March 23, 1983 a shipment of glass laboratory equipment tendered by Co-Op to Santa Fe pursuant to Contract T-116 was involved in a train derailment. Co-Op sued Santa Fe to recover the full actual value of the damaged goods. Santa Fe admitted liability for the loss, but argues that Santa Fe's liability is limited to a released rate of $.35 per pound as set forth in the November 22, 1982 transportation contract.
 
 
 9
 After the close of discovery Santa Fe filed a motion for summary judgment and Co-Op filed a motion for partial summary judgment, each taking opposing views upon the applicability of the released value provision. On July 3, 1985 the district court, in a memorandum opinion and order, rejected Santa Fe's motion and held that Co-Op was entitled to the full actual value of its damaged goods. The court left undecided the issue of what the actual value was. See Co-Operative Shippers v. Atchison, T. & S.F.R. Co., 613 F.Supp. 788, 795 (N.D.Ill.1985). However, the district court rejected Co-Op's secondary argument that Contract T-116 authorized the recovery of Co-Op's court costs, interest and reasonable attorney's fees. Id. Santa Fe filed a notice of appeal and Co-Op filed a notice of cross-appeal to the court's July order. These were later dismissed, however, as premature.
 
 
 10
 On November 25, 1985 the district court issued another memorandum opinion and order and held that its July order was not a final decision pursuant to 28 U.S.C. Sec. 1291. See Co-Op Shippers v. Atchison, T. & S.F.R. Co., 624 F.Supp. 797, 799 (N.D.Ill.1985). The district court found that Co-Op was due prejudgment interest and established that the interest rate ran from the date of derailment to the date of entry of judgment at the rate of 8.434 percent, compounded daily. Id. at 801. The district court found further that the salvage expenses incurred by Co-Op were reasonable and held Co-Op was entitled to judgment in the sum of $73,656.46 plus prejudgment interest.[2] Id. Santa Fe filed a new notice of appeal and Co-Op filed a new notice of cross-appeal.
 
 II.
 
 11
 Carriers may partially limit their liability on a "released valuation" basis whereby in exchange for a low transportation rate, the shipper is deemed to release the carrier from liability beyond a stated amount. See e.g. Klicker v. Northwest Airlines, Inc., 563 F.2d 1310, 1315 (9th Cir.1977). The released valuation limitations bind the shipper, however, only if the shipper has notice of the rate structure and is given a full and fair opportunity to obtain greater protection. Id.; see also New York, New Haven & Hartford R.R. Co. v. Nothnagle, 346 U.S. 128, 135-36, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953); Union Pacific R.R. Co. v. Burke, 255 U.S. 317, 321-23, 41 S.Ct. 283, 284-85, 65 L.Ed. 656 (1921); and Boston & Maine R.R. v. Piper, 246 U.S. 439, 444, 38 S.Ct. 354, 355, 38 S.Ct. 354, 62 L.Ed. 820 (1918).
 
 
 12
 This is not a case in which a carrier sought to limit its liability to a shipper by mere implication. Instead, Co-Op made a well informed, deliberate and absolute choice. Cf. Anton v. Greyhound Van Lines, Inc., 591 F.2d 103, 108 (1st Cir.1978) (carrier failed to properly limit its liability with an unsophisticated shipper where there was no written contract and no fair opportunity to chose between higher or lower liability by paying a correspondingly greater or lesser charge). In the instant case, it is undisputed that Co-Op held itself out as an experienced shipper. Thus, Contract T-116 was negotiated between parties of at least equal commercial awareness. See Mechanical Technology, Inc. v. Ryder Truck Lines, 776 F.2d 1085, 1088 (2d Cir.1985); see also Ruston Gas Turbines, Inc. v. Pan American World Airways, 757 F.2d 29, 32-33 (2d Cir.1985). It is also undisputed that the general manager for Co-Op's management company as well as Co-Op's Operations Department management personnel had ample opportunity to read Contract T-116 and ATSF Circulars TOFC-1 and No. 7000 before the transportation agreement was executed. In reality, it is difficult to imagine how any sophisticated shipper such as Co-Op could have had more opportunity or incentive to familiarize itself with the liability provisions of Contract T-116. See, e.g. Deiro v. American Airlines, Inc., 816 F.2d 1360, 1365 (9th Cir.1987).[3]
 
 
 13
 49 U.S.C. Sec. 10730(c) permits a rail carrier to establish limited liability transportation rates by written agreement between the rail carrier and shipper. Here, Santa Fe and Co-Op executed a written agreement, Contract T-116, and Santa Fe thereby fulfilled the requirements of 49 U.S.C. Sec. 10730(c).
 
 
 14
 49 U.S.C. Sec. 10505(e) permits a rail carrier to offer alternative terms notwithstanding section 11707, as long as the shipper's opportunity to receive section 11707 terms are also provided in the contract. See Yamazen U.S.A. v. Chicago and Northwestern Transp., 790 F.2d 621, 623 (7th Cir.1986). In the present case Santa Fe offered Co-Op an alternative term, released value liability. However, Co-Op still had a full and fair opportunity to receive section 11707 full actual value liability terms pursuant to Item 57 of TOFC-1 and Item 1017 of Circular 7000. We find Co-Op's argument that it did not have a full and fair opportunity to receive section 11707 full actual value liability terms unpersuasive. Co-Op's argument is further weakened by its admission that Co-Op's sophisticated shipping management personnel more or less skipped over the liability provisions. See Salbego dep. at 40; Garrity dep. at 30; and Lyons dep. at 54.
 
 
 15
 Co-Op also argues that Santa Fe's liability cannot be limited to released values because Items 52, 56 and 57 of TOFC-1 are confusing. Item 52 plainly states that Santa Fe's liability for loss or damage "shall be subject to released values as established by ATSF.... unless [the] shipper declares a higher value in the manner prescribed by Item 57." Item 57 of TOFC-1 states, "If section 11707 disability is desired, different shipping documents will be used and a different procedure must be strickly adhered to, without exception or modification...." Item 56 of TOFC-1 merely sets out a procedure whereby a shipper is allowed to notify Santa Fe by a "shipping order" of its request for a specific rate conditioned upon a released value for a particular commodity. Absent any notification that a shipper desires a specific released value rate for a specific commodity, Item 52 of TOFC-1 provides that the released values established by Santa Fe will apply. These established released values are found in Item 1016 of Circular 7000. Co-Op did not notify Santa Fe by a shipping order that it desired a specific released value rate for its shipment of glass laboratory equipment. Co-Op's argument is unpersuasive. We conclude that Santa Fe's liability to Co-Op is limited to a released rate of $.35 per pound as stated in their volume transportation contract. Thus, we reverse this part of the district court's decision.
 
 III.
 
 16
 Santa Fe argues that the district court erred when it granted summary judgment in favor of Co-Op on the issue of storage charges for the damaged goods. Santa Fe believes there was a genuine issue of material fact as to the reasonableness and foreseeability of the storage charges claimed by Co-Op. We agree.
 
 
 17
 The district court ruled that the deposition testimony referred to by both parties made clear that expenses paid and efforts of Co-Op to salvage the goods were reasonable. See Co-Operative Shippers, Inc. v. Atchison, T. & S.F.R. Co., 624 F.Supp. at 801. However, the deposition of Albert DiVito, Co-Op's Philadelphia representative, reveals that arguably little was done to salvage the damaged goods between the end of March and June or July of 1983, a three to four month period. DiVito dep. at 58. There also appears to have been some lengthy negotiating between Co-Op and VWR Scientific, the consignee of the shipment, as to what to do with the damaged goods. DiVito's deposition suggests VWR wanted to "dump the whole thing" at one point while Co-Op wanted to put the freight in "some kind of order" (i.e. get a detailed list of what was broken in each case) to "get the claim down to a reasonable level." DiVito dep. at 59-61. There are also discussions about a change in management at VWR in the m iddle of negotiations. DiVito dep. at 61. We note all this testimony comes from merely four pages of DiVito's deposition.
 
 
 18
 Co-Op contends that Santa Fe, in opposition of Co-Op's motion for entry of judgment in sum certain argued below, merely argued that the DiVito testimony was insufficient in explaining the reasonableness of the charges. We conclude, however, that the DiVito testimony outlined above in and of itself creates a genuine issue of material fact as to the reasonableness of the storage charges and the time expended in the salvage effort.
 
 
 19
 There is also a genuine issue as to whether the storage costs, if they are deemed excessive, amounted to consequential, unforeseeable damages outside Santa Fe's realm of responsibility. Item 52 of TOFC-1 states that "in no event shall ATSF be liable for special or consequential damages." See also F.J. McCarty Co. v. Southern Pacific Co., 428 F.2d 690, 693 (9th Cir.1970).
 
 
 20
 Santa Fe argued below that there was no indication the shipment, when tendered, contained laboratory glassware and that salvage costs for this type of shipment constituted consequential damages. In an effort to speed up the shipping process Co-Op supplied Santa Fe with weekly manifests rather than individual shipping orders. Co-Op's management personnel admit that often neither Co-Op nor Santa Fe knew what commodities were included in a shipment until after the fact. See Lyons dep. at 45. Santa Fe should have its day in court on this matter, as well.
 
 
 21
 We make no effort to determine the weight of the arguments from both sides on the salvage issue. It may be as Co-Op argues that this shipper merely took time to find the best salvage deal. We believe, however, that a ruling at the summary judgment stage was premature and we accordingly remand this decision to the district court for a hearing on this issue.
 
 
 22
 Any prejudgment interest granted to Co-Op by the district court would be inappropriate at this point, in light of our decision today. Santa Fe has not had the use of monies which were properly Co-Op's and hence there is no need to make Co-Op whole under the accepted rationale behind prejudgment interest awards. See generally Michaels v. Michaels, 767 F.2d 1185, 1204 (7th Cir.1985); and George R. Hall, Inc. v. Superior Trucking Co., 532 F.Supp. 985, 996-997 (N.D.Ga.1982). Any award of prejudgment interest at this point would be an abuse of discretion.
 
 
 23
 Co-Op's last argument is that it is entitled to recover costs, fees and interest pursuant to Item 37 of Circular TOFC-1. The district court found that Item 37 was intended to apply only to suits initiated by Santa Fe for the collection of freight charges from shippers or consignees and not to actions such as the one brought by Co-Op. See Co-Op Shippers, 613 F.Supp. at 795. We agree and affirm this part of the district court's decision.
 
 
 24
 For the reasons set forth above, this case is reversed in part, affirmed in part and remanded for a hearing on the issue of storage charges.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 We reject Santa Fe's argument that it should not be considered a "common carrier". The definitions section of the Staggers Act, 49 U.S.C. Sec. 10102 states, in pertinent part:
 Sec. 10102. Definitions
 In this subtitle--
 * * *
 (2) "carrier" means a common carrier and a contract carrier.
 * * *
 (4) "common carrier" means an express carrier, a pipeline carrier, a rail carrier, a sleeping car carrier, a motor common carrier, a water common carrier, and a household goods freight forwarder. (emphasis added).
 * * *
 (6) "contract carrier" means a motor contract carrier and a water contract carrier.
 * * *
 
 
 [2]
 The district court determined Co-Op's net loss as follows--
 The parties agree on several elements of damages: that the value of the damaged goods was $95,103.40, that Co-Op salvaged them for $42,332.16, and that it incurred $17,227.40 to salvage the goods, leaving a net loss of $73,656.46.... [However,] Santa Fe ... contends that the $17,227.40 in salvage costs were excessive and unreasonable. Co-Operative Shippers, Inc. v. Atchison, T. & S.F.R. Co., 624 F.Supp. 797, 799 (N.D.Ill.1985).
 
 
 [3]
 In Deiro, an experienced airline passenger sued American Airlines, Inc. (American) for breach of contract, negligence and willful and wanton behavior alleging damages of approximately $900,000 for the death of seven greyhound racing dogs and injuries to two others. Deiro's complaint alleged that his dogs were placed in the shipping cages and exposed unshaded to the sun in temperatures of approximately 97-99 degrees, without proper ventilation or water. Deiro also alleged that despite his warnings to American personnel, they never attended to his dogs and refused him permission to care for them himself. The seven dogs died from heat exposure
 The district court's order granted partial summary judgment for American and the Ninth Circuit affirmed. The Ninth Circuit held that American's liability was limited to a total of $750 pursuant to a baggage liability limitation contained in Deiro's ticket coupon.
 The parties before us have not raised the issue of whether a carrier can insulate itself from full actual value liability to a shipper in those instances where allegations of the carrier's gross negligence rise to the level set out by the passenger-shipper in Deiro. Therefore, we leave our discussion of this separate and distinct issue for another day.