**TOKIO MARINE AND FIRE INSURANCE COMPANY, LIMITED, as subrogee for Matsushita Electric Corporation of America, and Chiyoda Fire and Marine Insurance Company, Limited, as subrogee for Matsushita Electric Corporation of America, Plaintiffs–Appellants, Cross–Appellees,**

v.

**AMATO MOTORS, INCORPORATED, Raven Transport, Incorporated, also known as Raven Trailer Transport, and Chicago & Northwestern Transportation Company, et al., Defendants–Appellees, Cross–Appellants.**

Nos. 92–2264, 92–2265.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1992.

Decided June 11, 1993.

Rehearing and Rehearing In Banc Denied July 16, 1993.

Dennis Minichello (argued), James D. Reinfranck, Keck, Mahin & Cate, Arthur W. Friedman, Miller, Shakman, Nathan & Hamilton, Chicago, IL, for Tokio Marine and Fire Ins. Co., Ltd. and Chiyoda Fire and Marine Ins. Co., Ltd.

Peter W. Schoonmaker, Mark E. Condon, Condon, Cook & Roche, Chicago, IL, for Amato Motors, Inc.

Donald C. Shine, Kristen E. Crisp, Nisen & Elliott, Chicago, IL, for Raven Transport, Inc.

George T. Brugess (argued), Richard A. Haydu, Robert T. Opal (argued), Chicago &

Northwestern Transp. Co., Chicago, IL, for Chicago & Northwestern Transp. Co.

Gus Svolos (argued), Callahan, Fitzpatrick, Lakoma & McGlynn, Oak Brook, IL, Arthur W. Friedman, Miller, Shakman, Nathan & Hamilton, Chicago, IL, for American President Intermodal Co., Inc.

Before FLAUM and ROVNER, Circuit Judges, and LAY, Senior Circuit Judge.*

LAY, Senior Circuit Judge.

This is an interlocutory appeal certified to this court under 28 U.S.C. § 1292(b). The primary issue is the continued viability of applying the Carmack Amendment, 49 U.S.C. § 11707, to common carriers providing trailer on flatcar (TOFC) and container on flatcar (COFC) services.[1] The district court held that deregulation under the Staggers Act exempts common carriers providing TOFC/COFC service from liability under the Carmack Amendment. The court held, however, that the statute authorizing the Interstate Commerce Commission (ICC) to create exemptions, 49 U.S.C. § 10505, provided a cause of action for a shipper's loss during transit. We reverse.

FACTS

Matsushita Electric Corporation (Matsushita) manufactures Panasonic brand name electronics. Some are made in plants in the Pacific Rim and are then shipped to the United States and stored at the Panasonic/Airtrans Warehouse in Tacoma, Washington, before being moved to distribution centers elsewhere in the United States. In June of 1989, Matsushita entered into an agreement with Hub City of Los Angeles (Hub City), whereby Hub City would arrange the shipment of the goods from the warehouse in Tacoma to inland distribution centers.

In early December 1989, Hub City arranged the transportation of six containers of Matsushita goods from the Panasonic/Air Trans warehouse in Tacoma, Washington to the Panasonic warehouse in Arlington Heights, Illinois. To accomplish this move, it first contracted with a trucking company (Wockner Trucking) to move the containers from the Panasonic/Air Trans warehouse to the Union Pacific railyard in Tacoma. Then, Hub City contracted for the rail portion of the trip with American President Intermodal Company (API), who has longstanding agreements with Union Pacific and with Chicago and Northwestern Transportation Company (C & NW). Finally, it contracted with Amato Motors, Inc. (Amato) to move the containers by truck from the C & NW railyard to the Panasonic warehouse in Arlington Heights.

The containers left Tacoma on December 12, 1989, moving on Union Pacific flatcars from Tacoma to Council Bluffs, Iowa, where the train was interchanged to the C & NW. On December 15, 1989, Hub City notified Amato via facsimile that the containers would be arriving in Chicago the following day. Amato realized it could accommodate only two of the six containers, so it subcontracted with Raven Transport, Inc. (Raven) to transport the remaining four. Amato also informed Raven of the container numbers and special pick-up numbers in order for Raven to obtain the release of the containers from the C & NW railyard.

The shipment arrived at C & NW's Global One railyard in Chicago on the morning of December 16, 1989. At approximately 5:30 a.m. on December 18, 1989, a driver identifying himself as Wilson in Raven Tractor No. 105 arrived at the C & NW railyard. After giving the secret numbers at the checkpoint, the driver was allowed to leave the railyard with one of the containers. About one-half hour later, at 6:00 a.m., four tractors and drivers from Raven arrived at the C & NW railhead to pick-up the containers. As noted, however, one of the containers had previously been released to what appeared to be a Raven employee. Upon further inquiry, it

---

* Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

1. In TOFC or "piggyback" operations, trailers containing freight are pulled by motor carrier from the shipper to the rail ramp, moved by rail to the destination rail ramp, and then taken to their ultimate destination by motor carrier. COFC operations differ only in that at least one leg of the journey is by water. *Central States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1100 (D.C.Cir.), *cert. denied*, ___ U.S. ___, 112 S.Ct. 87, 116 L.Ed.2d 59 (1991).

was determined that Raven did not employ a driver named Wilson and that Tractor No. 105 was missing from its yard. The goods contained in this container were never delivered to the Panasonic warehouse in Arlington Heights.

Matsushita carried insurance policies through Tokio Marine and Fire Insurance Company (Tokio Marine) and Chiyoda Fire and Marine Insurance Company (Chiyoda). The loss of the container caused damages to Matsushita in the amount of $490,311.41, of which $452,117.41 was paid by Tokio Marine and $38,194.00 was paid by Chiyoda.

Tokio Marine and Chiyoda, as subrogees for Matsushita, sued to recover the amounts they paid. Initially, they sued Amato, Raven and C & NW, but later amended their complaint to add API as a defendant. Plaintiffs alleged a Carmack Amendment violation against all four defendants. They also pleaded three common law claims against defendants—breach of contract by Amato and API, negligence by Amato, Raven and C & NW, and a breach of the duty of due care as bailee against C & NW.

Defendants moved to dismiss the complaint, arguing that the Carmack Amendment no longer applied after deregulation; moreover, because the ICC retained jurisdiction over TOFC/COFC service, the common law claims were preempted. The district court agreed with defendants' arguments, noting that Congress appeared to have "unintentionally left a tear in the fabric of the law." In the absence of common law or Carmack Amendment liability, the court concluded that liability could be premised on the congressional statute authorizing the ICC to create exemptions [2] and the ICC regulation granting the TOFC/COFC exemption.[3] It permitted plaintiffs leave to replead based on this theory.[4]

All of the parties petitioned for certification for interlocutory appeal.[5]

## THE CARMACK AMENDMENT

In 1906, Congress incorporated common law principles relating to liability of interstate carriers in the Carmack Amendment to the Interstate Commerce Act.[6] Under the Carmack Amendment, the general rule is that the carrier is liable for actual loss or

---

**2.** 49 U.S.C. § 10505 (1980).

**3.** 49 C.F.R. § 1090.2; 46 Fed.Reg. 14,348 (1981).

**4.** Plaintiffs filed a second amended complaint with two counts: the first was brought under § 10505 (the district court's theory) while the second was based on federal common law. The district court dismissed the second count. *See* Order of January 6, 1992. Thus, the only remaining claim against defendants is that they are liable under the statute authorizing the ICC to grant exemptions and the ICC regulation exempting common carriers providing TOFC/COFC service.

We note that both API and Raven argued that they were not common carriers and therefore not subject to the jurisdiction of the ICC. Although API in its brief continues to assert that it is a broker and not a common carrier, the district court found that it was a common carrier. *See* Order of July 26, 1991. As to Raven, the district court initially found that it was a common carrier, *see* Order of April 15, 1991, but then withdrew that finding, *see* Order of May 15, 1991. The record does not reflect that the district court has finally resolved this issue. Under the posture of this case, we express no opinion as to whether Raven and API are in fact common carriers.

**5.** The parties seek review of the district court's orders dated April 15, 1991; May 15, 1991, 764 F.Supp. 115; July 26, 1991, 770 F.Supp. 426; and January 6, 1992.

**6.** At common law, common carriers were liable for loss or damage to goods essentially without regard to fault. 1 Saul Sorkin, Goods in Transit § 5.02 (1992). Although not an absolute insurer, the carrier was liable for the full extent of damages to the goods unless it could show the damage was caused by five specific exceptions—an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods themselves. *See Missouri P.R.R. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). Even at common law, however, carriers could limit their liability in a fairly narrow fashion: carriers and shippers could agree to a reduced value of the goods whereby the shipper would pay a lower rate in exchange for the lower risk incurred by the carrier. *Adams Express Co. v. Croninger*, 226 U.S. 491, 509–10, 33 S.Ct. 148, 153, 57 L.Ed. 314 (1913). Courts would enforce these "released value" agreements as long as the carrier gave the shipper the alternative of paying a higher rate in exchange for greater carrier liability. *See, e.g., Union P.R.R. v. Burke*, 255 U.S. 317, 321–23, 41 S.Ct. 283, 284–85, 65 L.Ed. 656 (1921).

injury to property. 49 U.S.C. § 11707(a)(1).[7] However, as at common law, the carrier and shipper could agree to limit the carrier's liability pursuant to a released value agreement. 49 U.S.C. § 11707(c), § 10730(c).[8] Under the Carmack Amendment, a shipper may recover from the receiving carrier, the delivering carrier, or any other carrier over whose line or route the property is transported. 49 U.S.C. § 11707(a)(1). In so providing, Congress intended "to relieve shippers of the difficult, and often impossible, task, of determining on which of the several connecting lines the damage occurred." *Missouri, K. & T. Ry. v. Ward,* 244 U.S. 383, 387, 37 S.Ct. 617, 619, 61 L.Ed. 1213 (1917); *see also Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 503, 94 L.Ed. 698 (1950).

THE STAGGERS RAIL ACT

In October 1980, Congress enacted the Staggers Rail Act.[9] The purpose of the Act was to rid railroads of unnecessary and inefficient regulations that impeded the railroads' ability to compete with other modes of transportation. H.R. Conf. Rep. No. 96–1430, 96th Cong., 2d Sess. 80 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 4110–11. Congress authorized the ICC to exempt persons or services from regulation in certain situations, 49 U.S.C. § 10505(a), and specifically identified transportation "provided by a rail carrier as a part of a continuous intermodal movement" as appropriate for deregulation, *id.* § 10505(f). Accordingly, in 1981, the ICC exempted from regulation rail and truck transportation provided by rail carriers in connection with TOFC/COFC service:

> Except as provided in 49 U.S.C. § 10505(e) and (g), ... rail TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt from the requirements of 49 U.S.C. subtitle IV....

49 C.F.R. § 1090.2; 46 Fed.Reg. 14,348 (1981).

However, Congress did not confer on the ICC unlimited authority to deregulate, but rather stated certain specific limitations. One such limitation is found at 49 U.S.C. § 10505(e) (the Matsui Amendment), which provides as follows:

> No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of

**7.** 49 U.S.C. § 11707(a)(1) provides in pertinent part as follows:

> A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title ... shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier ... and any other common carrier that delivers the property ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported
> ....

**8.** 49 U.S.C. § 11707(c) provides in pertinent part as follows:

> (1) A common carrier ... may not limit or be exempt from liability imposed under subsection (a) except as provided in this subsection....
>
> ·　·　·　·　·
>
> (4) A common carrier may limit its liability for loss or injury of property transported under section 10730 of this title.

49 U.S.C. § 10730(c) provides in pertinent part:

> A rail carrier ... may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier....

We note that originally the requirements for a released value agreement were found in 49 U.S.C. § 10730 and its predecessor section, § 20(11). In June 1980, however, Congress passed the Motor Carrier Act of 1980, which divided § 10730 into two subsections. Subsection (a) consisted of the former § 10730, but was made inapplicable to motor common carriers and rail carriers. Subsection (b) was added and applied specifically to motor carriers of non-household property. Subsection (c), quoted above, was added with the Staggers Rail Act of 1980 and applies to rail carriers.

**9.** Pub.L. No. 96–448, 94 Stat. 1895 (1980).

section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title.

## EFFECT OF DEREGULATION ON THE CARMACK AMENDMENT

■ Defendants argue, and the district court agreed, that they are no longer subject to the liability provisions of the Carmack Amendment after deregulation. It is urged that the ICC order exempts them from "the requirements of 49 U.S.C. subtitle IV," of which the Carmack Amendment is a part.

Defendants further contend that § 10505(e) does not preserve the Carmack Amendment as a *theory of liability* on which shippers may sue carriers for damage to exempt shipments; rather, it deals with the *amount* of recovery a shipper may obtain. Defendants focus on the phrase "contractual terms for liability and claims" in § 10505(e), particularly the word "contractual." As defendants interpret § 10505(e), deregulated TOFC/COFC carriers must offer full value rates as an alternative to released value rates in making contracts with shippers. If the carrier fails to offer full value rates, the shipper's recourse is not to sue the carrier under the Carmack Amendment for full value, but to file a complaint with the ICC. Otherwise, the shipper must sue the carriers with whom it has contracted to enforce those agreements.[10]

Although we agree with the defendants' argument that § 10505(e) does not create a private cause of action for shippers, we believe that defendants' interpretation of § 10505(e) as applied to the Carmack Amendment is incorrect. The ICC has interpreted this provision as requiring the continued applicability of the Carmack Amendment to deregulated TOFC/COFC carriers. In a

clarification issued June 22, 1981, the ICC stated that the exemption "does not and could not relieve rail carriers from the provisions of 49 U.S.C. 11707, concerning their liability for loss and damage." *Ex Parte No. 230 (Sub–No. 5),* 46 Fed.Reg. 32,257 (1981). The clarification goes on to explain as follows:

> 49 U.S.C. 11707 imposes, on the carrier, liability for actual loss or injury to property shipped unless released rates under 49 U.S.C. 10730 are involved. Released rates under 49 U.S.C. 10730 are at the election of the shipper as an alternative to otherwise applicable full liability rates. From this it follows that *our prior exemption could not enable carriers to disclaim their general loss and damage obligations.... We thus must emphasize that our exemption does not relieve the railroad from the provisions of 49 U.S.C. 11707, concerning their liability for loss and damage.* Indeed, we note that in our notice of proposed rulemaking ... we specifically pointed out that 49 U.S.C. 10505(e) provides the standards for liability which the railroads must continue to apply to exempt services, and that it *requires full value rates unless the shipper consents to limited liability rates.*

*Id.* (emphasis added).

■ We must defer to the construction of a statute by the agency responsible for the statute's administration, unless the agency's interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). We find the ICC's interpretation is consistent with congressional intent. The word "contractual" in § 10505(e) does not, in our opinion, signal an end to the era of Carmack Amendment liability and a turn to liability premised only on breach of contract. Even before the Staggers Rail Act and deregulation, shippers

---

10. Applying this logic to the facts of this case, defendants contended at oral argument that plaintiffs Tokio Marine and Chiyoda could sue the only party with whom Matsushita had a contract—Hub City. Hub City could be viewed, however, as Matsushita's agent. If that is true, then even under defendants' theory, plaintiffs could sue those parties with whom Hub City had contracted—API and Amato. We note that it appears from the record that defendants are arguing that Hub City is not simply a shipper's agent but rather a carrier. We express no opinion on the status of Hub City under the facts of this case.

and carriers entered into contracts for released value rates. 49 U.S.C. §§ 11707, 10730. In § 10505(e), we deem it clear that Congress intended that carriers still have the obligation of offering full value rates to shippers. Nothing within § 10505(e) is intended to repeal § 11707(a)(1) requiring liability of all carriers over whose line or route the property is transported. However, consistent with the reasons for deregulation, Congress gave carriers increased latitude in offering "alternative terms" to shippers. Thus, since deregulation, rail carriers still must offer full value rates, but they may offer alternative terms as well.

Defendants contend that implicit in our cases of *Cooperative Shippers, Inc. v. Atchison, T. & S.F. Ry.*, 840 F.2d 447 (7th Cir. 1988), and *Yamazen U.S.A., Inc. v. Chicago & N.W. Transp. Co.*, 790 F.2d 621 (7th Cir. 1986), is this court's recognition that shippers may no longer sue carriers under the Carmack Amendment, but rather must base their suit on breach of contract. We disagree. Plaintiff shippers, or subrogees as in this case, may still sue the carriers under the Carmack Amendment. However, as was the case before deregulation, carriers may plead as an affirmative defense that a limitation of liability applies, frequently in the form of released value rates. *See, e.g., S.B. Penick & Co. v. Blue Comet Express, Inc.*, 81 A.D.2d 505, 437 N.Y.S.2d 328 (Super.Ct.App.Div.1981); *see also* 2 Saul Sorkin, Goods In Transit § 13.24 (1993). Indeed, it appears that at least two of the defendants in this case pleaded as affirmative defenses that there was an agreement limiting liability.[11] Thus, contrary to defendants' argument, *Co–Operative Shippers*[12] and *Yamazen*[13] do not stand for the proposition that TOFC/COFC carriers were removed from the Act's jurisdiction, but rather that the carriers had simply fulfilled the requirements for exemption from full value liability.

11. API pleads as an affirmative defense that it had an agreement to limit liability with plaintiffs' agent, Hub City. It states that "[b]y agreement with plaintiffs' agent, Hub City of Los Angeles, API's liability pertaining to the shipment of plaintiffs' goods was limited by API's circular which provided that API would have 'no liability to shippers for cargo loss or damage arising out of the performance of rail common carrier services....'" In response, plaintiffs point out that the API Stacktrain Shipping Order states that "[t]his shipment subject to the liability provisions set forth in 49 USC sec. 11707." Conflicting affidavits and testimony on this issue are in the record. We note that courts have enforced agreements limiting liability between a carrier and the shipper's agent. *See Fabulous Fur Corp. v. United Parcel Serv.*, 664 F.Supp. 694, 697 (E.D.N.Y.1987); *see also generally* 2 Saul Sorkin, Goods in Transit § 14.13 (1993). However, we express no opinion on the merits of this defense.

C & NW asserts a somewhat different affirmative defense. It contends that "the plaintiffs entered into a shipping contract with Hub City wherein plaintiffs agreed to a limitation of liability that is binding on plaintiffs." Defendants argue that Matsushita accepted Hub City's released rate for shipping the goods in exchange for waiving a right of recovery against Hub City. Again, because of the procedural posture of this case, we express no opinion on the merits of this defense.

Finally, we note that all four defendants have served cross-complaints against some or all of the co-defendants. Pursuant to 49 U.S.C. § 11707(b), a carrier who pays for the shipper's loss may seek recovery from the carrier(s) actually responsible for the loss. In the case of API and C & NW, there is apparently an indemnity agreement that both defendants seek to enforce against the other. Again, because of the procedural posture of this case, we express no opinion on the merits of these ancillary claims.

12. In *Co–Operative Shippers, Inc. v. Atchison, T. & S.F. Ry.*, 840 F.2d 447 (7th Cir.1988), we upheld the application of released value rates in the context of an automatic released rate provision. There, the railroad's exempt circular provided for released value rates, but also stated that the railroad would ship goods subject to § 11707 terms should the shipper so request in the manner required by the circular. *Id.* at 449–50. We found that the offer of released value terms was an appropriate offer of "alternative terms" and that the shipper had been given a full and fair opportunity to receive full Carmack Amendment terms. *Id.* at 452. Thus, the railroad's liability to the shipper was limited to the released rate.

13. In *Yamazen U.S.A., Inc. v. Chicago & N.W. Transp. Co.*, 790 F.2d 621 (7th Cir.1986), the railroad's exempt circular required actions to be brought within one year whereas the Carmack Amendment prohibits limitations of less than two years. *See* 49 U.S.C. § 11707(e). However, the shipper had the option of specifying in the bill of lading that the shipment move under full Carmack Amendment terms for a higher rate. 790 F.2d at 623. We concluded that the shipper was bound by the liability restrictions where it had the opportunity to elect full liability rates but instead obtained lesser coverage in exchange for a less expensive rate. *Id.*

Other courts have found that the Carmack Amendment continues to apply to exempted TOFC/COFC service. *See American Trucking Ass'ns, Inc. v. ICC,* 656 F.2d 1115, 1124 (5th Cir. Unit A Sept. 1981) ("the exemption does not and could not relieve rail carriers from the provisions of 49 U.S.C. § 11707"); *Co–Operative Shippers, Inc. v. Atchison, T. & S.F. Ry.,* 613 F.Supp. 788, 791 (N.D.Ill. 1985) ("[a]lthough freed from most regulation, rail carriers offering TOFC/COFC service are still subject to the liability provisions of § 11707"), *rev'd on other grounds,* 840 F.2d 447 (7th Cir.1988).[14]

Accordingly, we answer the question posed to us—whether deregulation by the ICC of TOFC/COFC service under the Staggers Rail Act exempts common carriers from liability under the Carmack Amendment—in the negative.[15]

We find no authority to support the district court's theory that the statute authorizing the ICC to create exemptions, 49 U.S.C. § 10505, and the ensuing regulation, 49 C.F.R. § 1090.2, created an implied cause of action on which a shipper may sue. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

We therefore remand the matter to the district court with instructions to allow plaintiffs to replead their cause of action under the Carmack Amendment, 49 U.S.C. § 11707.

---

**14.** *See also* 1 Saul Sorkin, Goods in Transit § 5.02[4] (1992) ("where the exemption is one created by the Interstate Commerce Commission pursuant to the Staggers Rail Act of 1980, the Carmack Amendment provisions continue to be applicable to such otherwise exempt transportation unless alternative terms have been offered by the rail carrier and accepted") (footnote omitted).

**15.** This circuit has previously held that the Carmack Amendment preempts state common law remedies against a carrier for negligent damage to goods shipped under a proper bill of lading. *See Hughes v. United Van Lines,* 829 F.2d 1407, 1415 (7th Cir.1987) (holding that the remedy provision of the Carmack Amendment "preempts all state and common law remedies inconsistent with the Interstate Commerce Act"), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988).